We have one case this morning. Mantissa Corporation v. Ondot Systems, Lone Star National Bank, 2017, 2533. Mr. DeMarco. Your Honor, it's John DeMarco for Plaintiff Appellant Mantissa Corporation. As a preliminary matter, we'd just like to make you aware that about 10 months ago, the parties negotiated a settlement based on vacator of the lower court decision. The parties jointly moved the lower court, and after receiving three rejections, moved this court for a vacator that was denied. And then subsequently, this case was scheduled for oral argument. Thank you. We're well aware of that. Okay, thank you. May it please the Court. The invention here was identity-owner control over the use of their identity over computerized transaction networks in a specific way. I have two questions. Yes. Because the red brief says that despite Mantissa's, I'm quoting, attempts to show the improvement to a computer network, Mantissa fails to explain how exactly the improvement it identifies is a meaningfully concrete or transformative solution to something tangible. Yes. I want you to go right to it. Sure. The specification begins with explaining the problem with the prior art computer transaction networks. And the solution, the main solution at the time, in 2005, was something like LifeLock, a reactive method that would monitor transactions that would take place, store the information, analyze. So by then, the proposal was to design a system that would solve the problem of identity fraud over these networks. They did it by adding structure to a network. And that structure included a separate pathway between the identity owner, the holder of or the owner of, say, assets connected to the identity, and the user, which was a bank or credit card company or credit reporting network. If one looks at the claims, don't they just recite transmission of information electronically? It isn't that abstract. He said it does include sending of information over that. But it requires a specific order of those communications and specific information in the communications. Software. That's right. But I think that computer hardware is operated based on software. So a structure that's limited in a certain way by software still means there's a technology or structured hardware there. Technology being used to protect the identity. To protect the use of the identity. Money, credit report, would prepare a template. And that's in the claims. It's phrased as parameters. Would prepare the parameters, send those to the service provider. The templates identify some kind of identification information is required and conditions for use. Types of conditions for use. Okay. You're not there yet. That's fine. That's step one. Freeway transaction, right? You've got this person who has identity. Yes. And then there is a desire by that person to have some transaction occur with some other party.  And what the person who's owning their identity is saying to this middle person, there's sometimes I want my identity to be used and sometimes not. Right, right. But the key is... And so what I'm asking you to do is you're protecting my identity. Yes, it's an agent. The service provider can be thought of as an agent for the identity owner to control the use. And so what's new and novel about that? What's new? What's new? So the conventional transaction network included the... At the time the patent is filed, you're unaware, this is 102, 103 person, you're unaware everybody else is doing this. So they aren't, people aren't using computers for this transaction, right? No, they were, because the LifeLock system was for credit card processing. The beginning of the background discusses the credit card fraud transaction problem. Credit cards were operated over computer transaction networks. But the question here isn't what's new. That's a 102 question. Yes. The question here is what is non-abstract. Right, right, right. And so what's non-abstract is the creation of this new service provider, or a separate service provider, in a pathway... You mean having a middle person? I guess, so the way I look at it... A teller at a bank that's verifying a signature or a place where you're going to use your credit card and they're saying, I'm not certain it's you, let me show you your signature. There have been little people involved in this three-way transaction for a long time, right? Isn't that correct? Well, no, that example is just a two-way transaction. I think you're referring to the Ballas reference cited by the lower court. I'm saying there's a third thing, something that's happening to verify a relationship between the two players that are trying to use the card. So we have an identity owner here, a user, their bank, credit reporting agency, hospital holding their records, something like that. And then you have a source that wants to access the money or the patient records or the credit history. So there's already a three-party system to begin with. The service provider is added somewhere up here with a separate pathway over to the user to then control use of the identity before... ...the credit card owner and says, do you authorize this? What's different? Right. So the difference there is that's the user. That's the user. And it's the same thing as what's happening in the, kind of what's happening in the prior art, where you have somebody looking at a transaction that's taken place and then finding something suspicious. Okay. I call down to the bank and I say, I'm sending my secretary down to cash a check. Go ahead and do that. Have I just replicated your system? No, you haven't because they're the agent of the identity owner is going to the user. They're going to the user and the user is at the top of the decision hierarchy to determine whether use will take place. We are adding something to that structure with the service provider to take that control away. By adding the service provider and giving it only insufficient identification information, so it's not a point of exposure of the identification information and conditions for use. So I give my secretary a bearer letter that authorizes her as an agent to do that, or him as an agent. But again, they're going to the, they're going, they're contacting the user. The user is the one that's verifying identity. Well, if you said to Judge Waller, well, if there was a third person who could identify and verify that his secretary was actually the secretary, and he had sent information to that person to say, the way you'll know if it's my secretary is she has a white hat and a blue bag, then that would be your third guy. But those examples are... Without sounding rude, my question would be, so what? So what's so earth-shaking to you about having a way to verify that Judge Waller's secretary is actually the secretary as opposed to... But those examples are all referring to verification of identity. None of those examples are referring to conditions for use. The conditions for use are given in the... What's the difference? Well, the examples of the conditions for use are gas station from 5 p.m. to 6 p.m. when I'm driving home from work. I don't want anyone else charging something on my credit card outside those hours because that's going to be an imposter. Isn't that just a more sophisticated refinement of identifying Judge Waller's secretary? Well, I guess... Or saying it has to be the secretary who only can do it between 11 and 12 because that's her lunch hour, and if she doesn't have her time, you'll fire her. Right? So I don't understand myself why the refinements are sufficient to lift the claims out of a... Right. So you're presenting scenarios that I wouldn't argue are long-standing fundamental economic crashes, but you're trying to find out what the source of the invention was. They certainly are long-standing economic crashes. That sort of thing happens in business all the time. Yeah. But this was... The inventor was not trying to cover those types of arrangements. They had the ability to call their credit card company, cut up the credit card if they wanted to. He wasn't doing that. He came out of software engineering, implementing credit card processing systems at banks. He knew that the user was at the top of the decision hierarchy, right? Now, even though they could mutually agree upon some conditions, the user could know about the conditions. He was proposing a system where the user didn't know the conditions. So now, if that secretary comes along... When he had his goal in mind, he was able to go to software writing 101 and learn very quickly how to write the software to do this, and to buy himself a generic computer and feed the software into the computer. So the computer wasn't being asked to perform a trick it had never performed before in terms of being able to swallow that kind of software and process it effectively, right? The computer was being designed to do a trick it hadn't done before in a service provider. But there was nothing that prevented it. In DDR, the sense was that there was something in the way the computer functioned that said it didn't want to do that. Yeah. We're not arguing that we're improving how an individual computer operates. That is your problem. You're not arguing structural changes in the computer. You're arguing change in the software relating to the transmission of information. That's part of it. We're also arguing that there's additional structure here that wasn't in conventional practice. The additional computer at the service provider location in a separate pathway between the identity owner and the user. Let me just finish about the service provider, because I can see a lot of skepticism here. So that service provider needs to receive parameters from the user specifying both identification information and conditions for use. The user did not have access to those conditions. In the examples I think you're talking about, I get the impression the user is going to maybe be aware of those conditions by either a letter that the agent might have. The user is the bank or the hospital with the records. The person is going to release the credit. Right. Release the credit, release the funds, release the credit report. This terminology is a little bit... The amount of information that the owner of the identity can tell the intermediary so the intermediary can control whether the user releases the money is vast. There's no question about the number of restrictions creatively that your patent would allow. Right. Okay. So it wasn't... I mean, they certainly... The invention for them, they realized they needed to address... They were trying to address identity fraud over these anonymous widespread computer networks. And they thought, how can we do this? Set up a service provider. Okay. Well, the service provider needs to... It's as simple as that because you want... You've created another exposure point for the identification information. So they require only insufficient information at the service provider. It's in the claims or sent to the service provider, but sufficient enough to locate the identity owner's conditions. Check the conditions, send that back to the user. The user then sends the response to the merchant. But here's the interesting... Let's talk about the devaluation of identity that occurs with this system. If somebody finds your credit card, they don't know what conditions you've imposed on it. They have to go out and sort of guess. You use it... Try to attempt to use it at different locations. And if they're not lucky enough to guess the right conditions, they don't... It doesn't work. So they devalue the identity. Your time is just about exhausted, but why don't we hear from the other side? Yes. Thank you. We have three minutes of rebuttal back. Mr. Smith. Good morning, Your Honors. I may have pleased the court. The district court found Mantisa's patents ineligible after multiple rounds of motions dismissed, practice, a summary judgment hearing, a claim construction hearing, live-in testimony. And what did the district court say the abstract idea is? So that's found in Appendix 14. And basically, it was determining whether a given use of an identity is permitted based on information that is in itself insufficient to permit use of the identity. And for some of the claims, a changeable set of conditions. Where on 14 is that? In 14, I think it's in the middle. There's a block quote there from the judge. And so, and so what we see here is, the key here is that it's reflected in the claims, which I can go through. Is this determining whether a given use, that whole thing, is that the abstract idea? Yes. And this is, what she did is it encapsulated multiple claims through this. And the key here is information. And really what this patent goes to is just this concept of. Does that sound abstract to you? In my view, it absolutely is. Because really what we're talking about is just simply the idea of information that is insufficient to permit use of the identity. And being able to use, provide information that's insufficient to a service provider. Which is, I think as we heard from the other side, basically. Why wasn't the abstract idea protection, protection of the use of one's identity? I think that would also be a fair abstract idea for this at a somewhat higher level. Do the claims only recite steps which transmit information? Or do they have physical, tangible steps in addition? Well, really for example, claim one of the 027 patent, which is in appendix 75, that effectively, it just has three steps. Receiving, determining, and sending. So the service provider receives the insufficient information effectively. So you're saying that's all abstraction? It's just the same. It's just simply receiving data, making a determination, and sending it. What about claim one of the 456 patent? The only real difference there is we're talking about the ability to basically temporarily change the condition. So for example, I can, let's say, in a credit card scenario, say I want to allow it for a while, and then change it. You can call American Express and say I'm going to be overseas for two weeks. Exactly. In these countries. That's an example. Filling stations for this week in the month and not otherwise. That's right. It only works maybe, in the patent they have an example of it, it doesn't work maybe at night. The only way I can see this thing working is if, for example, someone invented a chip that projected the fingerprint in the photo of the individual and then there was hardware which allowed the merchant to take the fingerprint. There's something along those lines. And I think here, what we haven't ever seen is any actual inventive concept, any tangible technical improvement. The inventor had testified in the district court level in front of the judge that the inventions were used on conventional hardware and I think that we've heard that admission here as well. So really the only difference from a conventional system was the interjection of this service provider which as we heard was effectively a third party intermediary. And that's exactly the construct in the Alice case. That was a third party intermediary for a settlement situation and that was found abstract. In other words, that's just another link in the chain of transmission of information. It is, Your Honor. It's an intermediary to make the process better and more efficient in some way. But that's really all this patent covers. Just this abstract idea of putting the service provider into this chain. And what we heard too was from the other side was that this service provider was in a pathway but there's nothing in the claims that talks about any specificity about this particular pathway. That's the generic computer and or software that everyone agrees here was just generic. So there's no improvement to that software. There's no improvement to that system. It's just simply the service provider. And the other point here too is I think this was invented by the thuggers in like the 13th or 14th century when they came up with the idea of letters of credit that maybe I think we found numerous at the district court levels there was a plethora of different examples being discussed at the hearing. One of them was a check example where banks had a book of checks and you would confirm the check that had the same signature as the one in the book. That's another example. I think your example of the basically delegating certain responsibilities to an assistant or secretary and for example just telling the security guard at the bank or someone at the bank I've told my secretary she has these rights and maybe the bank keeps a book of the assistants and what the assistants are allowed to do with respect to financial transactions of the folks they work with. I think that's another example. It's a service provider. They use cash checks up to $100. They can cash checks up to $100. You can write in a book. So everything in these patents you could do with a phone. You could do with a piece of paper or a pencil. Maybe not even that. You could probably just do it in your head as long as there's someone else you're dealing with and you've talked to and they can remember things. That's about it. There's nothing remotely technical about these claims. And I think the other thing we talked about was this insufficient information. That's one thing in the brief talked about as a potential inventive concept but the patent specification mentions that the insufficient information can be things like your name, your address, the last four digits of your credit card number. And these are all things that in our everyday lives we've called a 1-800 number and they asked the last four digits of our credit card number. That's the same concept. It's insufficient information to use the credit card but it is sufficient for someone on the other end of the line to identify who you are. And that's exactly the same concept. So it's insufficient information. It's not an inventive concept. Well, if these claims are abstract as you say, if these are good ideas, how does one protect them? Well, I think the way, I think as we heard, there could be definitely very specific implementations. For example, how is it that the service provider makes the determination? The claims, all they require is that it determines something. But if you had a claim that was specifically on here's the software steps that you actually in hardware Well, those are still abstractions, aren't they? Well, I think if you had a lot of detail about how the determining step, for example, worked, I think that would be a lot closer. I mean, for example, you could look at the SRI Cisco case. That would be sufficient to make this not an abstract idea or sufficient to make an abstract idea patentable? What's the difference? You're talking about adding some more bells and whistles at this intermediary person's position? I think that's probably more of a step two. If they found a step two in terms of inventive concepts, like you said, it would still be abstract, perhaps. Right, but if each of these things you're adding are things you could write down with a pencil to tell the intermediary person to act or not act depending on those conditions, why does the enlargement of the number of potential stop orders that the intermediary has, why does that matter? I think what I was referring to, Your Honor, to clarify, would be some real specifics about the actual  the improvement to a computer necessary for something like a service provider that actually ran on some sort of a tangible specific piece of hardware. But if it's done with garden variety software run through a generic computer, I think then it wouldn't be happening. I'm having a hard time understanding why you're giving this away. No. Well, I think this is a case where I think there, I'm not sure what exactly the claim would look like where it would be, it would pass step two. I mean, here we have a patent that doesn't answer generally, but in the electronics fields, if you start with an abstract idea, you'd better come up with something wild and crazy new that the computer is doing to save it from abstraction. That's right. That's right. In other words, not more abstraction. That's right. More abstraction is not going to help. You actually have to have something concrete. And I think this is a claim where it's reflected in the spec and the dependent claims. Because it's not limited to even the particular field. For example, even if this had been limited to credit cards, I think we would still be in an abstract scenario. But this applies to credit card transactions, building key access, so in other words, actual physical security is an example they have that would be encompassed by the claims. In other words, this isn't a breadth issue. This is an abstraction issue. It's not a 112 issue. No. This is an abstraction problem and there's nothing in the claims that saves it from that. We have two patents here. That's right. They both suffer from the same infirmity? They suffer from the same infirmity in the district court. And her articulation of the abstract tried to account for the difference in some of the claims of the 456 patent, which was, as we discussed a little bit earlier, that was the changeable nature. In other words, you can temporarily change your credit card limit or temporarily allow someone to do something with your identity and then it changes back. A little puzzle by the Hail Mary you've got on part C on page 60 of your brief. You say, heaven forbid, we should reverse the district court on 101, then we ought to enlarge the judgment by dealing with the question of the transfer. That's right. You have to file a cross appeal to make that argument, don't you? You can't ask us to enlarge the judgment in a required way. Well, Your Honor, we believe we had properly preserved it since the Well, just answer the question simply. I mean, you know what the rules are on cross appeals. You're coming in here and saying, well, you'd like a different judgment to be issued. You make a fair point. And you can't do that without a cross appeal. Which is why I crossed it out and wrote move. I agree, Your Honor. Well, the problem is we've had, you know, lots of times in the past. This is not an example of that, but for a long time, we've had this argument properly should have been presented, I believe, in a cross appeal if you're going to make it for the future. And there were some other issues raised by Mantisa in his briefing, and if Your Honor would be interested, I could answer any further questions on that. If not, I would just yield the rest of my  Fine, thank you, Mr. Smith. Thank you, Your Honor. Mr. DeMarco, three minutes if you need it. Thank you. So I think two cases are helpful to analyzing this situation. The first one is McGrow. McGrow involved steps that were intended to be performed on a computer, although there's no computer hardware recited in the claims, and this court found that the unconventional steps in a certain order brought the subject matter out of, you know, abstractness, and found it past Alice Step 1. The second case I find helpful is Ancora. The claim is just it was to software licensing where key information that could have been in any memory was located in the BIOS memory of a computer, and the lower court found that to be abstract. Putting the key information in the BIOS memory is just one of the many memories you can put it in, and it's no big deal. Fair warning tracks the prior art. It's a passive, it's a reactive system that looks for suspicious activity and then alerts somebody after the suspicious activity has occurred. So very much like the reactive system that we talk, that the inventor specifically says they want to design an environment where the key information is located in the BIOS memory versus other memory was found by this court to be something significant. Why? Because a hacker has a harder time to access the BIOS memory of a computer than other parts. Similarly, we've moved key information of these conditions known only to the service provider and the identity owner off site from the user into a, you know, into the service provider. If a hacker is going to enter the system, they're most likely going to go to the user where the property is. It's going to be harder for the user    BIOS memory of the   the other parts of the system. So, that's a start. But, look, there's also the insufficient information in there. And I think it was a very well covered example outside of Firebase and I give the wrong sign, they give the wrong counter sign. That's insufficient information and I shoot them. Well, I think your insufficient identification information, right? Well, there's certainly examples of insufficient information everywhere, but the use of it here was new in computer transaction processing by virtue of the fact that you've got a service provider that wasn't in the structure beforehand. Thank you. Thank you very much,